IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | CIVIL ACTION NO. _____ |
| v. | : | |
| MATTHEW CONNOLLY, | : | |
| Defendant. | : | |

**COMPLAINT**

The Freedom of Access to Clinic Entrances (FACE) Act, 18 U.S.C. § 248, prohibits the intentional interference with persons obtaining or providing reproductive health services.

On August 27, 2021, Defendant Matthew Connolly obtained illegal access to a secure patient space at a Planned Parenthood facility in Philadelphia without staff permission or knowledge and barricaded himself in a restroom. Once discovered, for over three hours, Connolly verbally refused all orders and physically thwarted all efforts by facility staff and law enforcement to open the restroom door and leave the facility. Fearing for the safety of staff and patients, staff directed patients to leave the facility, and law enforcement ordered the building evacuated and the neighboring street and intersections shut down. Connolly only left the building when SWAT officers forced open the restroom door and carried him out on a stretcher.

Connolly took these actions with the intention of interfering with people's ability to provide and obtain reproductive health services. Facility staff subsequently learned that Connolly was an active member of "Red Rose Rescue," an activist group whose tactics are aimed at obstructing access to reproductive services. At the time of this incident, Connolly had

been involved in at least 19 previous disruptions and attempted disruptions of access to reproductive care at facilities. When he was taken into police custody, Connolly was carrying anti-abortion literature. Immediately after the event, Connolly stated that he would "do it again."

As a result of Connolly's actions, the reproductive health facility had to be evacuated and closed for the day, and no patient—whether they had an appointment or sought walk-in care—received services. Connolly thus, by physical obstruction, has, in violation of the FACE Act, intentionally interfered with people who were obtaining or providing reproductive health services because they were obtaining or providing such services. Unless enjoined, he is likely to continue to do so.

For these reasons, the United States of America brings this action seeking damages, civil penalties, and injunctive relief against Connolly under the FACE Act, 18 U.S.C. § 248.

## I.  JURISDICTION AND VENUE

1. The United States is authorized to bring this action pursuant to the FACE Act, 18 U.S.C. § 248(c)(2).

2. This Court has jurisdiction over this action pursuant to the FACE Act, 18 U.S.C. § 248, and 28 U.S.C. § 1345.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this complaint occurred in this judicial district.

## II.  PARTIES

4. Plaintiff is the United States of America.

5. Defendant Matthew Connolly resides in Minnesota.

### III.     GENERAL FACTUAL BACKGROUND

#### A.     The FACE Act and its History

6.     Before the FACE Act passed in 1994, anti-abortion protestors used a variety of tactics to block entry to reproductive health services facilities in order to prevent providers and patients from providing or obtaining abortions, including physical obstruction, intimidation, and threats and acts of violence.

7.     The FACE Act was passed with bipartisan support "in the wake of [such] continuing violence against, and other forcible interference with, abortion clinics, their staffs, and their clientele by radical elements of the anti-abortion movement." United States v. Soderna, 82 F.3d 1370, 1372 (7th Cir. 1996).

8.     The FACE Act prohibits a person from, among other things:

> by force or threat of force or by physical obstruction, intentionally injur[ing], intimidat[ing] or interfer[ing] with or attempt[ing] to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services[1]. . .

18 U.S.C. § 248(a)(1).

9.     The FACE Act provides that any person who violates the Act is liable to the United States for: (1) damages in the amount of $5,000.00 for each person aggrieved by a defendant's actions; and (2) a civil penalty in the amount of not more than $10,000 for first violations and not more than $15,000 for subsequent violations, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. *See* 18 U.S.C. § 248(c)(2)(B)(i)-(ii); *see also* 28

---

[1] The term "reproductive health services" means "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services related to pregnancy or the termination of a pregnancy." FACE Act, 18 U.S.C. § 248(e)(5).

3

C.F.R. § 85.5 (noting currently applicable penalties of not more than $18,444 for a first nonviolent physical obstruction violation and $27,750 for a subsequent nonviolent violation).

10. The FACE Act further provides that any person who violates the Act is subject to temporary, preliminary, or permanent injunctive relief. 18 U.S.C. § 248(c)(2)(B).

B. **Red Rose Rescue and Connolly's History of Intentional Disruptions of Access to Care**

11. Red Rose Rescue ("RRR") is an anti-abortion group that organizes events across the country in which participants trespass on the property of reproductive health facilities and refuse to leave voluntarily in order to cause the facilities to stop operating. RRR has been active since at least 2017.

12. RRR actions are part of a broad effort to disrupt the provision of reproductive health services across numerous states.[2]

13. In general, RRR events are a coordinated effort by anti-abortion activists to temporarily shut down reproductive health service facilities in order to impede persons from obtaining or providing reproductive health services.

14. In addition to the August 27, 2021 event that is the subject of this action, Connolly has regularly engaged in unlawful and obstructive behavior while participating in RRR events at reproductive health services facilities across the United States since at least 2017.

15. Connolly has been arrested at least eight times by police in at least four states.

16. In these arrests, Connolly has been charged with, among other violations, trespassing, resisting arrest, and interference with a business.

---

[2] Monica Miller, 2020 Red Rose Rescue Conference: Why Do I Rescue? (Dec. 12, 2020), https://www.youtube.com/watch?v=q40HZ2Bv4F0&list=PL1TmA9lq8zIw0Zr38oB0Lu-C5gagMuTW7&index=7 [https://perma.cc/3JW4-2BME]

4

17. Connolly has been convicted at least four times.

### IV. THE AUGUST 27, 2021 INTERFERENCE ACTION

18. On August 27, 2021, persons, including persons affiliated with RRR, conducted an obstruction of services at the Elizabeth Blackwell Health Center at Locust Street (the "Health Center") and the Locust Street Surgical Center (the "Surgical Center") (collectively, the "Locust Street facility") located at 1144 Locust Street, Philadelphia, PA, 19107.

19. The Locust Street facility is operated by Planned Parenthood of Southeastern Pennsylvania.

20. The facility is a "facility" that provides reproductive health services as those terms are defined in the FACE Act, 18 U.S.C. § 248(e)(1), (e)(5).

21. On August 27, 2021, at or around 8:20 a.m., Connolly entered the lobby of the Health Center at the Locust Street facility.

22. Connolly did not have an appointment, and the security officer directed him to the front desk.

23. The front desk staff advised Connolly that he did not have an appointment and would need to make an appointment to enter the Health Center.

24. The patient care area of the Health Center is a secure area, separated from the lobby by double doors that are locked.

25. Persons seeking access to the patient care area of the Health Center thus require permission to enter from facility staff.

26. Despite being told that he needed an appointment to access the Health Center, which he did not have, Connolly made his way through the double doors and into the secure patient care area.

27. Upon information and belief, Connolly passed through the ordinarily locked doors when authorized persons were entering or exiting the secure area.

28. By approximately 8:23 a.m., Connolly had barricaded himself in a patient restroom along the hallway of this secure area.

29. A staff member asked Connolly to come out of the restroom.

30. Connolly refused to come out of the restroom.

31. The staff member notified the front desk that Connolly was in the restroom and would not come out.

32. The security officer was notified and came to the restroom door.

33. The security officer repeatedly instructed Connolly to vacate the restroom, but he refused to vacate the restroom.

34. The security officer then unlocked the restroom door from the hallway side.

35. Even with the door unlocked, Connolly physically obstructed the door to prevent the security officer from opening it.

36. Fearing for their safety, Locust Street facility staff evacuated patients and staff out of the Locust Street facility.

37. Staff also called the Philadelphia Police Department at approximately 8:40 a.m.

38. Police arrived at the facility at around 8:49 a.m.

39. Police entered the Health Center and instructed Connolly to open the restroom door.

40. Connolly refused to open the restroom door.

41. Police attempted to negotiate with Connolly to open the restroom door and leave the facility.

42. Connolly refused to open the restroom door and leave the facility.

43. When the Connolly continued to refuse to leave the restroom, the police declared a "barricade situation."

44. Police ordered that all persons except law enforcement personnel vacate the facility.

45. Police also closed Locust Street and both intersections in the immediate vicinity of the facility to traffic and pedestrians.

46. When Connolly refused all efforts by the police to get him to open the door to the restroom and leave the facility, a SWAT team was called.

47. The SWAT team subsequently arrived and directed Connolly to open the restroom door and leave the facility.

48. Connolly refused to open the restroom door and leave the facility.

49. With Connolly refusing all orders to open the restroom door, and to voluntarily vacate the restroom and facility, the SWAT team broke through the bathroom door and forcibly removed Connolly from the premises at approximately 10:56 a.m.

50. Connolly was carried out of the facility on a stretcher.

51. Connolly was then taken into custody for a psychological evaluation at a nearby hospital.

52. Connolly stated to medical staff, at that time, that he would perform these acts again.

53. Upon returning to the Locust Street facility following Connolly's forced removal, the Health Center manager discovered roses in the Health Center waiting room.

54. Messages attached to some of the roses indicated that the flowers had been left behind by RRR protesters.

55. RRR subsequently claimed responsibility for the event and described Connolly as a "rescuer" and noted that "[d]ue to the rescue, no unborn children were killed at the clinic."

56. As a result of Connolly's actions, the Locust Street facility was closed for the remainder of the day.

57. In total, at least 44 surgical and other appointments had to be rescheduled as a result of the Locust Street facility's closure.

58. Through the actions described above, Connolly, by physical obstruction intentionally injured, intimidated, or interfered with, or attempted to injure, intimidate or interfere with, persons because those persons were, or had been, obtaining reproductive health services.

59. Through the actions described above, Connolly, by physical obstruction intentionally injured, intimidated, or interfered with, or attempted to injure, intimidate or interfere with, persons because those persons were, or had been, providing reproductive health services.

60. Connolly's actions also intimidated such persons or any other person or class of persons from obtaining or providing reproductive health services.

61. Connolly's actions on August 27, 2021, caused the closure of the Locust Street facility for the entire day.

62. Through his unlawful actions at the Locust Street facility, and the subsequent closure of the facility, Connolly made ingress to or egress from the facility impassable and/or rendered passage unreasonably difficult or hazardous.

63. Upon information and belief, unless enjoined by this Court pursuant to 18 U.S.C. § 248(c)(2)(B), Connolly will continue to violate the FACE Act in the manner set forth above.

**Count I**
**Violation of the FACE Act**
**18 U.S.C. § 248(a)(1)**

64. The United States incorporates by reference the foregoing paragraphs as though fully set forth herein.

65. Connolly's conduct constitutes a physical obstruction that intentionally intimidated or interfered with persons, or an attempt to intimidate and/or interfere with such persons, because they were or had been obtaining reproductive health services, or in order to intimidate such persons from obtaining reproductive health services at the Locust Street facility in violation of 18 U.S.C. § 248(a)(1).

66. Connolly's conduct constitutes a physical obstruction that intentionally intimidated or interfered with persons, or an attempt to intimidate and/or interfere with such persons, because they were or had been providing reproductive health services, or in order to intimidate such persons from providing reproductive health services at the Locust Street facility in violation of 18 U.S.C. § 248(a)(1).

67. As a result of the foregoing, Connolly is liable to the United States for: (1) a civil penalty in the amount of not more than $18,444 for first violations and not more than $27,750 for subsequent violations; (2) damages in the amount of $5,000.00 for each person aggrieved by Connolly actions; and (3) appropriate injunctive relief. *See* 18 U.S.C. § 248(c)(2)(B) and 28 C.F.R. § 85.5.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests judgment in its favor and against Defendant Matthew Connolly as follows:

  A. For the amount of damages owed to each aggrieved person, 18 U.S.C. § 248(c)(2)(B);

  B. Awarding such civil penalties as are permitted by law, 18 U.S.C. § 248(c)(2)(B);

  C. Order appropriate injunctive relief pursuant to 18 U.S.C. § 248(c)(2)(B); and

  D. Awarding all such other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial.

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

MAURA M. KLUGMAN
Deputy Chief
Special Litigation Section

/s/ Jelena Kolic
JELENA KOLIC
EMILY C. KELLER
Trial Attorneys
Special Litigation Section

        Civil Rights Division
        U.S. Department of Justice
        950 Pennsylvania Avenue, N.W.
        Washington, DC 20530
        (202) 598-0149